UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **MARINE SHALE PROCESSORS, INC.** | * | **CIVIL NO. 6:09-0353** |
| **VERSUS** | * | **JUDGE DOHERTY** |
| **WESTON SOLUTIONS, INC., ET AL.** | * | **MAGISTRATE JUDGE HILL** |

<u>REPORT AND RECOMMENDATION</u>

The Motion for Summary Judgment filed by Weston Solutions, Inc. ("Weston") has been referred to the undersigned for Report and Recommendation. [rec. docs. 39and 41]. Plaintiff, Marine Shale Processors, Inc. ("MSP") has filed Opposition to which Weston has filed a Reply. [rec. docs. 44 and 47].

For the following reasons, it is recommended that Weston's Motion for Summary Judgment [rec. doc. 39] be **GRANTED**, and accordingly, that this action be **DISMISSED WITH PREJUDICE**.

BACKGROUND

The instant lawsuit was filed by MSP against Weston seeking damages in excess of $2,000,000.00 for the theft of, and damage to, copper wiring and equipment at the MSP facility located in Amelia, Louisiana ("the facility"). The facts pertinent to this motion are not in dispute.

The facility has not been in operation since 1996, following court ordered closure. Pursuant to a Stipulation of Settlement and Judgment, in an action by the United States Department of Justice and the State of Louisiana against MSP and its owner, John Kent, Sr.,

remediation of contamination at the facility was to be performed by the Louisiana Department of Environmental Quality ("LDEQ"). *See United States et al. v. Marine Shale Processors, Inc., et al.*, 2:90-wd-01240 (E.D. La.) rec. docs. 1644 and 1649, approved September 11, 2006; *see also* rec. doc. 1642, approved June 6, 2006, Consent Order Granting Access and Institutional Controls.

In accordance with the Stipulation of Settlement and Judgment, LDEQ requested bids from contractors to perform remedial clean-up work. Weston was the low bidder. Under a contract between the LDEQ and Weston, Weston was to disassemble, demolish, decontaminate and dispose of thirteen tanks at the facility and to treat and dispose of any contaminated waste material in the tanks.

Weston began work in September, 2007 and the work was completed in March, 2008, at which time, Weston departed the facility. On November 4, 2008, MSP's facility caretaker, Sid Moffett ("Moffett"), purportedly discovered that copper wiring at the plant was missing and that a substantial amount of equipment at the facility was damaged or missing. Moffett reported the alleged theft to the St. Mary Parish Sheriff's Office on November 5. The incident was investigated by the Sheriff's Office; no arrests have ever been made, nor has the person responsible for the theft or damage been identified.

On March 6, 2009, MSP filed the instant lawsuit. In its Complaint, MSP alleges that Weston is responsible for the theft of, and damage to, its property under two theories of liability denominated as "Counts" in the Complaint. Count One alleges that MSP is a third

2

party beneficiary of the contract between LDEQ and Weston, and that MSP, as third party beneficiary under the contract, was damaged by Weston's breach of its obligation to protect the property owned by MSP at the facility. Count Two alleges that Weston negligently supervised its employees and subcontractors which resulted in the loss of, and damage to, its property.

Section 4.1 of the contract between LDEQ and Weston contains the following provision entitled "General Site Management." It is this provision on which MSP relies for its third party beneficiary status.

> The Contractor shall be responsible for the protection and safety of all work, materials, equipment, and other property on the site against vandals and other unauthorized persons during mobilization, on-site work, and demobilization. No claims shall be made against LDEQ by reason of any act of an employee or trespasser. All damage, injury or loss to any property caused directly or indirectly, in whole or in part, by the Contractor shall be remedied by the Contractor at his expense.

LDEQ's Responses to Bidder Inquiries are attached to, and form a part of, the contract.[1]

Question 20 and the Response thereto is as follows:

> Question #20: What is LEDQ's expectation of site security, it was noted during the walk-through that the community was not happy with this site. Are there concerns about site control?
>
> Answer #20: The site is fairly secure as is. The public should not be allowed on-site during the project and the gates should be secured at departure. The LDEQ currently does not have any concerns about site control.

---

[1] During oral argument, the undersigned *sua sponte* questioned whether the questions and answers formed a part of the contract. However, Ms. Hadwin attached, as Exhibit "A" to her affidavit, "a true and correct copy of the contract", which attachment includes the questions and answers. These questions and answers were completed prior to the bid, and thus apparently form a part of the bid request, which is part of the contract. Moreover, MSP has not disputed that these items constitute a part of the contract. Therefore, in the absence of any competent evidence to the contrary, for purposes of this Motion, the undersigned will treat the questions and answers as a part of the contract.

Question 28 and the Response thereto is as follows:

Question #28: Is security going to be needed at the site during non-working hours?

Answer #28: No. The LDEQ does not require after-hours security. However, please be reminded that the Contractor shall be responsible for the protection and safety of all work, materials, equipment, and other property on the site against vandals and other unauthorized persons during mobilization, on-site work, and demobilization. No claims shall be made against LDEQ by reason of any act of an employee or trespasser.

## **LAW AND ANALYSIS**

### **Standard on Motion for Summary Judgment**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

Rule 56(e) provides, in pertinent part, as follows:

When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Weston's Motion for Summary Judgment is properly made and supported. Thus, MSP may not rest upon the allegations in its pleadings, but, rather, must go beyond the pleadings and designate specific facts demonstrating that there is a genuine issue for trial. *Celotex v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553-54 (1986). A "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Stults v. Conoco, Inc.,* 76 F.3d 651, 654 (5th Cir. 1996) *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

However, metaphysical doubt as to the material facts, conclusory allegations, unsubstantiated assertions and those supported by only a scintilla of evidence are insufficient. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Additionally, summary judgment is mandated against a party who fails to make a showing sufficient to establish an essential element of that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 106 S.Ct. at 2552.

MSP has submitted evidence in opposition to the instant Motion. However, MSP's evidence fails to demonstrate that there is a genuine issue of material fact necessitating a trial on its claims against Weston. Accordingly, and for the reasons which follow, the undersigned recommends that Weston's Motion for Summary Judgment be granted.

**Third Party Beneficiary**

MSP argues that section 4.1 of the contract between LDEQ and Weston contains a stipulation *pour autrui*, whereby responsibility for any damage to, or loss of, property at the facility owned by MSP occasioned by anyone, including Weston employees, vandals and/or unauthorized persons, was assumed by Weston. Accordingly, MSP argues that Weston is liable for the claimed loss of, and damages to, its property.

Weston argues that section 4.1 does not constitute a stipulation *pour autrui* in favor of MSP. Rather, Weston contends section 4.1 was intended solely to require that Weston be

responsible for protecting its own property from loss or damage by vandals or unauthorized persons. In support of this argument, Weston has submitted the uncontroverted affidavit of Vicki Hadwin, the drafter of the contract at issue herein. In further support, Weston cites the LDEQ's Responses to question numbers 20 and 28 posed by the prospective bidders, quoted above.

Alternatively, Weston argues that even if section 4.1 confers third party beneficiary status on MSP, there is no record evidence demonstrating that Weston is responsible, directly or indirectly, for any loss or damage to MSP's property.

Louisiana law applies to this diversity case. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Under Louisiana law, a contract may contain a provision which confers rights in favor of a third party; in Louisiana such a provision is known as a stipulation *pour autrui*. *Joseph v. Hospital Service Dist. No. 2,* 939 So.2d 1206, 1211 (La. 2006). For a stipulation *pour autrui* to exist, three requirements must be met. First, the stipulation for a third party must be "manifestly clear." Second, there must be "certainty as to the benefit provided the third party." Third, the benefit must not be "a mere incident of the contract" between the contracting parties. *Id.* at 1212.

With respect to the first requirement, the Louisiana Supreme Court has explained as follows:

> The most basic requirement of a stipulation *pour autrui* is that the contract manifest a clear intention to benefit the third party; absent such a clear manifestation, a party claiming to be a third party beneficiary cannot meet his burden of proof. A stipulation *pour autrui* is never presumed. The party claiming

the benefit bears the burden of proof. *Joseph*, 939 So.2d at 1212.

The Louisiana Supreme Court has further explained that the second factor, certainty as to the benefit provided, is a corollary of the requirement of a manifestly clear stipulation. "To create a legal obligation enforceable by the beneficiary there must be certainty as to the benefit to accrue to the beneficiary." *Id. citing Berry v. Berry*, 371 So.2d 1346, 1347 (La. App. 1st Cir. 1979), *writ denied*, 373 So.2d 511 (1979).

In connection with the third requirement, that the benefit cannot be a mere incident of the contract, the Louisiana Supreme Court has noted that "not every promise, performance of which may be advantageous to a third person, will create in him an actionable right. The problem is to separate the cases where an advantage has been stipulated from those where the advantage relied upon is merely an incident of the contract between the parties." *Id.* at 1212-1213.

Weston has submitted the affidavit of Ms. Hadwin in support of its argument that the contracting parties did not intend to confer any benefit on MSP. However, MSP argues that under the parol evidence rule, this court may not consider that evidence. MSP's argument is well taken.

Under Louisiana law and jurisprudence, parol evidence is generally inadmissible to vary the contents of a document or to show the intentions of the parties when it is already clear from the fact of the document itself. *Guidry v. Hedburg,* 722 So.2d 1036, 1038 (La. App. 3rd Cir.

7

1998) *citing* La.Civ.Code art. 1848.[2]  The parol evidence rule typically applies only to actions between the parties to a contract, not to actions between parties to the contract and third persons. *Guidry,* 722 So.2d at 1040 *citing Hobbs v. Central Equip. Rentals, Inc.*, 382 So.2d 238, 243 (La. App. 3 Cir. 1980), *writ denied*, 385 So.2d 785 (La. 1980) ("[t]he parol evidence rule applies only to actions between the parties to an act or contract and their privies, and not to actions between the parties and third persons.").

---

[2] La. Civ. Code art. 1848 reads as follows:

Testimonial or other evidence may not be admitted to negate or vary the contents of an authentic act or an act under private signature. Nevertheless, in the interest of justice, that evidence may be admitted to prove such circumstances as a vice of consent, or a simulation, or to prove that the written act was modified by a subsequent and valid oral agreement.

The principles of the admissibility of parol evidence regarding written contracts are well settled. The Third Circuit explained in *Guidry v. Hedburg* as follows:

Legal agreements have the effect of law upon the parties, and, as they bind themselves, they shall be held to a full performance of the obligations flowing therefrom. *Kean v. Lemaire,* 451 So.2d 151, 153-54 (La. App. 1st Cir. 1984). Courts are bound to give legal effect to all contracts, according to the true intent of the parties, and the intent is to be determined by the words in the contract when they are clear and explicit and lead to no absurd consequences. LSA-C.C. arts.2045 and 2046; *Massachusetts Mutual Life Insurance Company v. Nails*, 549 So.2d 826, 832 (La. 1989); *Foret v. Louisiana Farm Bureau Casualty Insurance Company*, 582 So.2d 989, 991 (La. App. 1st Cir. 1991); *Ransom v. Camcraft, Inc.*, 580 So.2d 1073, 1077 (La. App. 4th Cir. 1991); *Borden, Inc. v. Gulf States Utilities Company*, 543 So.2d 924, 927 (La. App. 1st Cir. 1989), *writ denied*, 545 So.2d 1041 (La. 1989); *Schroeter v. Holden*, 499 So.2d 309, 311 (La. App. 1st Cir. 1986). *See also Kean v. Lemaire*, 451 So.2d at 154. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. *Borden, Inc. v. Gulf States Utilities Company,* 543 So.2d at 927. The rules of interpretation establish that when a clause in a contract is clear and unambiguous, the letter of the clause should not be disregarded under the pretext of pursuing its spirit. *Cashio v. Shoriak*, 481 So.2d 1013, 1015 (La. 1986); *Borden, Inc. v. Gulf States Utilities Company*, 543 So.2d at 927. As a general rule, parol evidence is inadmissible to vary, modify, explain, or contradict a writing. *Kean v. Lemaire*, 451 So.2d at 154.

722 So.2d at 1038-1039.

The Louisiana Supreme Court has not squarely decided whether the parol evidence rule applies in a case where the issue is the existence, *vel non*, of a stipulation *pour autrui*. When this court, sitting in diversity, is presented with a point of state law which has not been decided by the Louisiana Supreme Court, the task of this court, under *Erie,* "is to determine how the Louisiana Supreme Court would resolve the issue if presented to it." *American Waste & Pollution Control Co. v. Browning-Ferris, Inc.,* 949 F.2d 1384, 1386 (5th Cir. 1991) *quoting Coatings Mfrs., Inc. v. DPI, Inc.*, 926 F.2d 474, 479 (5th Cir. 1991). When the state's highest court has not definitively ruled upon an issue, federal courts must make an "*Erie* guess" as to what the state's highest court would most likely decide. *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 558 (5th Cir. 2002). In making an *Erie* guess, federal courts "defer to intermediate state appellate court decisions 'unless convinced by other persuasive data that the highest court of the state would decide otherwise.' " *Id. quoting First National Bank of Durant v. Trans Terra Corp.,* 142 F.3d 802, 809 (5th Cir. 1998).

In the context of a contract which confers a stipulation *pour autrui*, the Louisiana Third Circuit Court of Appeal has held that the parol evidence rule is equally applicable with respect to the purported third party beneficiary. *Guidry,* 722 So.2d at 1040. The Third Circuit found that this is so because a person who enjoys such status is a "privy" to the contract which confers a stipulation *pour autrui* in his favor.[3] *Id.* In the absence of any other persuasive data

---

[3]The *Guidry* court found, in pertinent part, as follows:

> The common law term "privy" is defined as, "A person who is in privity with another. One who is a partaker or has any part or interest in any action, matter, or thing." Black's Law Dictionary, 5th Ed. If Elmer is a third-party beneficiary, he

that the Louisiana Supreme Court would decide otherwise, the undersigned cannot disregard the Third Circuit's decision.

Introduction of parol evidence is unnecessary where there is no question regarding the written terms of the contract. *Id*. "If the language of the agreement is explicit and unambiguous, the contract must be enforced as written." *Id. citing Sanders v. Ashland Oil, Inc.*, 96-1751 (La. App. 1 Cir. 1997); 696 So.2d 1031, 1037, *writ denied*, 97-1911 (La. 1997); 703 So.2d 29. In this case, the language of the contract between LDEQ and Weston is explicit and unambiguous. As more fully explained below, based on the language used in the contract between the LDEQ and Weston, the intent of the parties is clear. Accordingly, parol evidence need not be considered.

Interpretation of contracts is governed by Louisiana Civil Code articles 2045 through 2057. Under Louisiana law, contracts must be construed so as to lead to logical conclusions and to give effect to the obvious intentions of the parties. *Lambert v. Maryland Cas. Co.*, 418 So.2d 553, 559 (La. 1982). Furthermore, "[a] provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective." La. Civ. Code art. 2049. "Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a

---

is surely a privy to a contract which confers a stipulation *pour autrui* in his favor. He has the right to enforce the contract or demand performance from the promisor. La. Civ. Code art.1981.

722 So.2d at 1040.

whole." La. Civ. Code art. 2050. "A cardinal rule in the construction of contracts is that the contract must be viewed as a whole and, if possible, practical effect given to all its parts, according to each the sense that results from the entire agreement so as to avoid neutralizing or ignoring any of them or treating them as surplusage." *Id*. *See also Texas Eastern Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 743 (5th Cir. 1998) (interpreting Louisiana law) ("Each provision in a contract must be interpreted in light of other provisions giving each provision a meaning suggested by the contract as a whole and avoiding any interpretation that neutralizes or ignores any provision or treats it as surplusage.").

Therefore, this court must determine the intent of the parties as expressed in the contract without rendering any part of the instrument meaningless. Moreover, "[s]ome effect is to be given to every word or clause if possible, for a court may not impute to the parties the use of language without meaning and effect." *Lambert*, 418 So.2d at 560. Accordingly, this court must not interpret the contract to render certain phrases or words mere surplusage.

Section 4.1 of the contract consists of three sentences. MSP argues that the phrases "other property" and "any property", contained in the first and third sentences, respectively, evidences a clear intention to confer a benefit in favor of MSP, that is, to protect its on-site property. Weston, on the other hand, reads the section, in its entirety, as conferring no such benefit, but, instead, reads the section as only requiring Weston to be responsible for its own property. Considering section 4.1 in light of the above legal precepts, construing all three sentences in context with each other, and in context with the remainder of the contract, without

rendering any sentence or word meaningless, leads to the following construction.

The court is required by the rules of contractual interpretation to give effect to all parts of the contract. From the content, and the way in which the first sentence of section 4.1 was constructed, it appears clear that this sentence was intended to cover only damage or loss caused by "vandals or unauthorized persons." This sentence does not apply, however, to Weston or its employees. Rather the third sentence of the section protects LDEQ from "damage, injury or loss" caused "directly or indirectly, in whole or in part" by Weston. This construction satisfies the rule of contract construction that requires practical effect be given to all parts of the contract without treating any part of the contract as surplusage.

This does not end the inquiry, however, because the issue presented by the motion is not only who damaged, or allowed the damage, to the MSP property, but, also, what property is covered by section 4.1, and, specifically, was property belonging to MSP intended by LDEQ and Weston to be covered by the section?

Again, the court starts with the way in which the sentences in section 4.1 were constructed by the scrivener. With regard to the items covered, the first sentence of section 4.1 provides that Weston is responsible for "all work, materials, equipment and other property on the site." At first glance, because of the inclusion of the term "other property" in the sentence, it appears that the property covered by that provision is very broad. However, reading the phrase "other property" in this sentence together with the rest of the sentence and the rest of the contract makes it clear that the breadth of the language is considerably more narrow than it

seems at first glance.

The MSP site is fairly extensive, covering over forty-four acres. This contract was merely for the removal of thirteen tanks, not for the clean-up of the entire MSP site. The contract was denominated as "Phase I Waste Removal." [rec. doc. 39, Ex. 1-A, bates number MSP-00515]. In fact, the specifications of the contract expressly stated that the contract was to "provide limited waste removal services." [rec. doc. 39, Ex. 1-A, bates number MSP-00515]. The contract also provided that the site work was generally limited to "weekdays only during daylight hours." [rec. doc. 39, Ex. 1-A, bates number MSP-00524]. Finally, it was made clear by LDEQ that after-hours security was not required.[4]

Since LDEQ and Weston contracted for Weston to perform only limited work on the site, on weekdays, during daylight hours only, it makes no sense whatsoever that LDEQ and Weston intended to have Weston protect MSP from any damage or theft to MSP property that occurred on the MSP site during the contract period, even if caused by vandals or trespassers after hours. This conclusion is further supported by LDEQ's Response to Bidder Inquiry # 20, wherein LDEQ stated explicitly that, as regards site security, its only expectation was that the public should not be allowed on-site during the project and that the gates should be secured at departure.

Clearly, LDEQ's minimal requirements for site security and the absolute lack of a requirement for after-hours security is inconsistent with the broad assumption of liability by

---

[4] In response to pre-bid question 28, LDEQ answered "The LDEQ does not require after-hours security."

Weston which MSP would have the court read into this contract. Rather than a broad reading, the site security requirement and the lack of after-hours security set out by LDEQ is much more consistent with the construction urged by Weston, and adopted by the court.

The first sentence of section 4.1 describes that for which Weston is responsible as "all work, materials, equipment and other property." Of course the "work" was to be done by Weston. Therefore, it follows logically, from the way that this sentence was constructed, that the "materials, equipment and other property" refers to those items used by Weston to perform the "work" required by the contract.

Indeed, MSP apparently agrees that the words "materials" and "equipment" refer to items owned or used by Weston to accomplish the "work." MSP does not explain why, after limiting "materials" and "equipment" to items owned or used by Weston to do the work required by the contract, that the term "other property" found in the same sentence, should be read more expansively.

Simply stated, there is no reason to read the term "other property" more expansively. Rather, it makes more logical sense to read the term "other property" with the same restriction as admittedly applies to the two words ("materials" and "equipment") which immediately precede "other property." It appears clear to the undersigned that all three items comprise a list, and refer to those things which Weston needed to do the "work" required by the contract.[5]

---

[5] It is inconceivable to the undersigned that if LDEQ and Weston had intended to make Weston essentially the guarantor of the security for the MSP site that there would not have been a separate contractual provision in that regard. MSP's argument that the parties intended that result by incorporating it into section 4.1 as a part of a listing which includes items admittedly needed by Weston to do the work required by the contract is simply inconceivable to the undersigned.

It follows from this construction of the first sentence of section 4.1, that the use of the term "any property" in the third sentence of section 4.1 simply means all property identified in the first sentence of that section. Simply speaking, rather than again listing the words and terms used in the first sentence, the LDEQ drafter used the term "any property" to mean those items listed specifically in the first sentence. Since the scrivener, in drafting the third sentence of section 4.1, in effect adopted the terms used in the first sentence, that adoption clearly included the limitations used in the first sentence, that is, the limitation that the items to be used by Weston to perform the work required by the contract.

Furthermore, the construction urged by MSP, that the term "any property" as used in the third sentence of section 4.1 includes MSP's property makes the sentence superfluous. If Weston were to damage property owned by MSP, Weston would be liable for any damage it caused even absent the contractual provision; therefore, there is no need for a contractual provision in that regard. Indeed, this is at least tacitly conceded by MSP since the negligent supervision claim made in Count Two of the Complaint is based on an alleged violation of article 2315 of the Louisiana Civil Code.

Accordingly, the undersigned construes section 4.1 to unambiguously limit the property covered by section 4.1 to be the property that Weston used, or was to be used, in accomplishing the object of the contract. Therefore, section 4.1 does not contain a stipulation *pour autrui* in

favor of Weston.[6] Hence, there is no genuine issue of material fact for trial and Summary Judgment is therefore properly granted with respect to MSP's third party beneficiary claim.

**Negligent Supervision**

A claim against an employer for the torts of an employee, based on the employer's alleged direct negligence in hiring, retaining, or supervising the employee, is generally governed by the same duty-risk analysis used for all other negligence cases in Louisiana. *Griffin v. Kmart Corp*, 776 So.2d 1226, 1231 (La. App. 5th Cir. 2000) *citing Jackson v. Ferrand,* 658 So.2d 691, 698 (La. App. 4 Cir. 1994), *writ denied,* 659 So.2d 496 (La. 1995).

A finding of liability in a negligence case requires proof of five elements: (1) proof that the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) proof that the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) proof that the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) proof that the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) proof of actual damages (the damages element). *Fowler v. Roberts*, 556 So.2d 1, 4-5 (La. 1989).

The first element is usually a question of law decided by the court; the other four elements are usually questions of fact to be decided by the jury, unless reasonable minds could

---

[6]To the extent that there is any ambiguity in the interpretation of section 4.1, which the undersigned does not find, consideration of the parol evidence submitted by Weston mandates the same result. That uncontroverted parole evidence clearly establishes that it was not the intent of the parties to the contract to confer any benefit on MSP. Accordingly, Summary Judgment on that basis would likewise properly granted.

not differ. *Id*.

The duty owed in a negligent supervision case is the duty of reasonable supervision. *Doe ex rel. Doe v. DeSoto Parish School Board*, 907 So.2d 275, 280-281 (La. App. 2nd Cir. 2005).[7] Thus, for liability to attach, there must be a breach of the duty of reasonable supervision. *Id.* at 281. The causation element is satisfied under Louisiana Civil Code article 2315 if it is proven that the breach was the cause-in-fact of the plaintiff's injuries. Accordingly, in a breach of supervision case, this element can only be satisfied if it is proven that "but for" the lack of reasonable supervision, plaintiff's injuries would have been prevented. *Id.*

In this case, there is no evidence that Weston breached its duty of reasonable supervision. To the contrary, the evidence submitted by Weston demonstrates the exact opposite. *See* Weston Exhibits 1, 3 and 4. While MSP argues that Weston is liable because it placed its employees in a unique position to steal and vandalize its property, there in no evidence that any Weston employee committed any of these criminal actions. The uncontroverted record evidence establishes that, after thorough investigation by the St. Mary Parish Sheriff's Office, no arrests have ever been made, nor have the persons responsible for the theft or damage been identified. *See* Weston Exhibit 9.

Moreover, even if this court were to find a breach of Weston's duty of reasonable supervision, which is not supported by the summary judgment evidence, the causation element

---

[7]While the *Doe* court primarily analyzed the duties of a school board through its teachers under article 2320, the court noted that the School Board's independent liability was the same under both articles 2315 and 2320, as each required a breach of the duty of reasonable supervision. 907 So.2d at 281.

cannot be satisfied. There is no evidence that Weston caused the complained of damages and losses. No witness has testified that he or she observed Weston removing or damaging MSP's property. Moreover, there is no evidence demonstrating when the damages and losses where were incurred, and, more specifically, demonstrating that the damages and losses did not occur in the seven month period after Weston left the facility. Given that there was a seven month lapse from the time that Weston left the facility until the time that the claimed losses and damages were allegedly discovered and reported, this court cannot find that "but for" the lack of reasonable supervision, MSP's injuries would have been prevented.

MSP presents the court with three photographs: one photograph depicts a Weston employee cutting a conduit, one depicts intact conduit and the final photograph depicts the same area where the conduit had been removed. Both of these last two photographs depict Weston employees in the background. MSP has also submitted affidavits to the effect that no tanks were in the areas depicted which required the cutting through or removal of these conduits in order for Weston to accomplish the work under the contract. MSP urges this court to infer, on the basis of these three photographs and corresponding affidavits, that Weston breached its duty of reasonable supervision and, thereby, directly or indirectly, caused all of its claimed damages and losses.

On Motion for Summary Judgement, such assertions, when supported by only a scintilla of circumstantial evidence, are insufficient to defeat the Motion. *See Little*, *supra.* Based on the insufficient evidence presented, the court simply cannot infer that Weston breached its duty

of reasonable supervision or that Weston, directly or indirectly, caused all of MSP's claimed damages and losses. Furthermore, given the circumstantial, inconclusive nature of the photographic and testimonial evidence presented, it is abundantly clear that no reasonable jury could return a verdict in favor of MSP on this scant evidence. Hence, there is no genuine issue of material fact for trial. *See Stults citing Anderson, supra.*[8]

Finally, while MSP contends that its damages were the result of actions of Weston employees, it is equally, if not more, likely that the claimed losses and damages were the result of vandals or trespassers. This is particularly true, given the uncontroverted evidence that equipment and copper wire had previously been stolen from the facility and, as in the present case, no arrests were made and the persons responsible for the theft or damage have never been identified. *See* Weston Exhibits 6 and 8.

Furthermore, the undersigned finds it highly improbable that if the theft had occurred during the time that Weston was on the site, that MSP's site caretaker, Moffett, would not have discovered the theft until seven months after Weston left the site.

In light of the above, MSP has failed to make a sufficient showing to establish the essential elements of its negligent supervision claim. *Celotex, supra*. Summary Judgment is therefore properly granted as to this claim also.

---

[8] At oral argument, counsel for MSP referred to other circumstantial evidence that had been obtained in discovery. Counsel for Weston objected that this evidence was not in the record. Counsel for Weston is correct; the court has not considered any evidence that is not in this record.

## CONCLUSION

For the reasons stated above, **IT IS RECOMMENDED** that Weston's Motion for Summary Judgment [rec. doc.39] be **GRANTED**, and accordingly, that this action be **DISMISSED WITH PREJUDICE**.

Because of the rapidly approaching trial date and pre-trial conference, the court notified the parties, at oral argument, that the court would likely reduce the time within which the parties could file objections to this report and recommendation to ten (10) days. Both parties agreed. Accordingly;

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of its service, shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.** *Douglass v. United Services Automobile Association*, **79 F.3d. 1415 (5th Cir. 1996).**

Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

Signed this 16th day of November, 2010, at Lafayette, Louisiana.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE